Jessica Garland
(State Bar No. 344535)
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336
*jessie@guptawessler.com*

Matthew W.H. Wessler*
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

Kristi C. Kelly*
Andrew J. Guzzo*
Matthew G. Rosendahl*
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
*kkelly@kellyguzzo.com*
*aguzzo@kellyguzzo.com*
*matt@kellyguzzo.com*

*Attorneys for Plaintiff Ashley Hicks*
* *pro hac vice* forthcoming

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### Eureka Division

| | |
|---|---|
| ASHLEY HICKS, *individually and as a representative of the class*,<br><br>Plaintiff,<br><br>v.<br><br>COHO FINANCIAL d/b/a PATH LENDING, DENNIS GLEN MILKS, THUNDERBIRD SERVICES, LLC, DONALD DUNCAN, and JOHN DOES Nos. 1-15,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL FOR:**<br><br>1. Violation of RICO, 18 U.S.C. § 1962(a)<br>2. Violation of RICO, 18 U.S.C. § 1962(b)<br>3. Violation of RICO, 18 U.S.C. § 1962(c)<br>4. Violation of RICO, 18 U.S.C. § 1962(d)<br>5. Violation of California Usury Law, Cal. Civ. Code § 1916-2, 1916-3<br>6. Declaratory Judgment<br>7. Unjust Enrichment |

1    Plaintiff Ashley Hicks ("Plaintiff"), on behalf of herself and the classes set

2   forth below, files this Class Action Complaint and Demand for Jury Trial against

3   Defendants Coho Financial d/b/a Path Lending ("Path Lending"), Dennis Glen

4   Milks ("Milks"), and Thunderbird Services, LLC ("Thunderbird"), Donald Duncan

5   (collectively, "Defendants'), and the yet-to-identified tribal officials and nontribal

6   coconspirators, John Does 1-25, whose identities have been intentionally concealed

7   and/or are not publicly available, and alleges as follows:

8    **INTRODUCTION**

9    1.    Over the past five years, there have been dozens of class actions

10   relating to the tribal lending model. These cases have resulted in the return of

11   hundreds of millions of dollars to consumers, as well as the cancellation of over

12   two billion dollars of usurious loans.[1] Despite these significant recoveries (and

13   federal court decisions admonishing these practices), many companies still use the

14   tribal lending model to originate blatantly illegal loans.

15   2.    Ms. Hicks is a California consumer who received several of these

16   illegal, high-interest loans over the internet, supposedly made by an online lending

17   company doing business as Path Lending.  Path Lending holds itself out as a

---

[1] *See, e.g.*, *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Doc. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Doc. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Doc. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner*, No. 3:19-cv-250, Final Approval Order at Doc. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (NKM/JCH), Preliminary Approval Order at Doc. 187 (granting preliminary approval of a class settlement providing $1.4 billion in debt cancellation and a common fund of $37.3 million).

company owned and operated by the Guidiville Band of Pomo Indians of the Guidiville Indian Rancheria (the "Tribe"), a federally recognized Native American tribe located in California.

3. Ms. Hicks's loans from Path Lending—all for less than $1000 each—charged Annual Percentage Rates of 675.27%, 793.08%, 790.79%, 906.97%, and 813.86%, respectively. By comparison, California's interest rate cap on loans issued by unlicensed lenders (such as those issued to Plaintiff here) is only 12%, more than *56 times* lower than the lowest interest rate charged on Plaintiff's loans. *See* Cal. Civ. Code § 1916-2.

4. Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id*. This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as "rent-a-tribe," a "recent incarnation of payday lending regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 753 (2012).

5. Non-tribal payday lenders and third-party funders use this model to seek to circumvent state legal prohibitions on usurious lending by searching for a small, easily dominated tribe willing to serve as the consumer-facing façade for the usury scheme, in return for receiving a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs. The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors running the operation to make the dubious and legally incorrect claims that (a) the loans are subject only to tribal law, not the protections

created by state usury and licensing laws, and (b) that they themselves are somehow vicariously protected by the tribe's sovereign immunity.

6.     In this case, Path Lending holds itself out as a tribal lending entity owned and operated by the Tribe. The Tribe is in turn controlled by the Guidiville Tribal Council, which is vested by the Tribe's Constitution with the power to "administer tribal assets and manage all economic affairs and enterprises of the Tribe," including "creat[ing] tribal, federal, and state corporations and/or any other legal form of business entity." Defendant Donald Duncan is the current chairperson of the Tribal Council, which comprises a chairperson, vice-chairperson, secretary, treasurer, and member-at-large. The remaining members of the Tribal Council are not publicly available but can be identified and added to this case through discovery. Pursuant to its authority, the Tribal Council chaired by Duncan directs, controls, and oversees the economic affairs and enterprises of the Tribe, including Path Lending and the other lending entities chartered by the Tribe ("Tribal Lending Entities" or "TLEs").

7.     Defendant Michael Derry is the longtime CEO of the Tribe's economic development holding company and, through this role, directs and manages the lending partnerships of the Tribe, including the activities of Path Lending.

8.     Although ostensibly owned and operated by the Tribe, in reality, the Tribe has very little involvement in the operation of the lending business and simply offers the shield of tribal sovereign immunity in return for a small portion of the profits from the lending enterprises it sponsors.

9.     The masterminds behind the scheme are instead nontribal members and the entities that they control, including the Defendant Dennis Milks, who, through his company Thunderbird and its yet-to-be-identified investors and employees, provides and manages the funding, marketing, loan origination,

underwriting, loan servicing, electronic funds transfers, and collections of the high-interest loans issued by Path Lending.

10. Nearly all of Path Lending's operations, including the origination and servicing of the loans, are also located off-reservation, on non-tribal land.

11. In return for running the day-to-day operations of Path Lending, Milks and his coconspirators receive the overwhelming percentage of Path Lending's profits.

12. Defendants have actively participated in the lending enterprise fronted by Path Lending and have conspired with each other and others not yet known to Plaintiff to repeatedly violate state lending statutes resulting in the collection of unlawful debts from Ms. Hicks and members of the classes described below.

13. This lawsuit challenges the legality of Path Lending's high-interest loans by seeking damages and declaratory relief against co-conspirators participating in this illegal scheme. Specifically, Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and California's usury and licensing laws. Defendants have likely collected tens of millions of dollars on void loans in violation of federal and state usury, licensing, and criminal statutes.

**PARTIES**

14. Plaintiff Ashley Hicks is a resident of Porterville, California.

15. Defendant Coho Financial d/b/a Path Lending is an online lender of small-dollar, triple-digit interest loans that holds itself out as an entity formed under the laws of the Tribe, which is located in California.

16. Defendant Dennis Glen Milks is a natural person who, upon information and belief, resides at 7615 N. Donnelly Avenue, Kansas City, Missouri 64158.

17.     Defendant Thunderbird Services, LLC is a Delaware limited liability company with its principal place of business in Kansas City, Missouri.

18.     Donald Duncan is a natural person residing in California.  He is the chairperson of the Guidiville Tribal Council.  As chairperson, Defendant Duncan's duties include the chartering and oversight of Path Lending and the other TLEs.  In performing these duties, Defendant Duncan meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation of each entity; the appointment and removal of the board members of the Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Duncan only in his individual capacity, while seeking injunctive and declaratory relief against him in his official capacity as a Tribal Council member.

19.     The John Doe Defendants 1-15 are the as-yet unknown members of the Tribal Council and nontribal individuals and business organizations that authorized, designed, are operating, and have extracted most of the revenue from the tribal lending enterprise.  Their identity, which, at least with respect to the nontribal coconspirators, has been hidden as a key part of the underlying scheme, will be established in this litigation.  To the extent the John Doe Defendants include Tribal Council members, Plaintiff seeks damages from those officials in their individual capacitates, while seeking injunctive and declaratory relief against them in their official capacity as Tribal Council members.

**JURISDICTION AND VENUE**

20.     The Court has jurisdiction over this action under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and 1332(d)(2).  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

21.    The Court has personal jurisdiction over Defendants.  Defendants either reside and/or conduct business in this State, including issuing and servicing loans here, and their conduct giving rise to this Complaint occurred in this State.

22.    Venue is proper in this District under 28 U.S.C. § 1965(a) because Defendants have transacted their affairs in California, including the making and collection of loans to likely thousands of borrowers in California.  Venue is also proper under 28 U.S.C. § 1965(b) because Path Lending is a resident of this Division and District and a substantial part of Plaintiff's claims occurred in California and this Division and District, where the Tribe is located.

## FACTUAL ALLEGATIONS

### Ms. Hicks's Loan violated California Usury and Licensing Laws

23.    Usury laws prohibit lenders from charging borrowers excessively high rates of interest on loans.  These laws have ancient origins, and usury prohibitions have been part of every major religious tradition.  As Pope Francis put it: "Usury humiliates and kills. Usury is a grave sin. It kills life, stomps on human dignity, promotes corruption, and sets up obstacles to the common good."[2]

24.    In the United States, "[u]sury legislation to cap interest rates on loans predates the founding of our country."[3]  *See Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Peterson, *supra* n. 4, 92 MINN. L. REV. at 1116, n.13).  In addition to general usury laws, most states have adopted small-loan statutes that allow specifically defined, small-amount loans at higher

---

[2] *See* David Watkins, *Pope Francis: Usury humiliates and kills*, VATICAN NEWS (Feb. 3, 2018), https://www.vaticannews.va/en/pope/news/2018-02/pope-francis-usury-financial-exploitation.html (last visited Aug. 20, 2024).

[3] *See* Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 MINN. L. REV. 1110, 1117 (2008).

1  rates, conditioned on the lender obtaining a license and complying with the

2  restrictions contained in the statute.

3      25.    California, which was founded in 1850, has regulated interest rates

4  since 1872. *See* Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan.

5  L. Rev. 1381, 1385 (1966).

6      26.    The California Constitution specifically limits the interest payable

7  "[f]or any loan or forbearance of any money" to not "more than 10% interest per

8  annum on a loan," except as state law provides. *Dev. Acquisition Grp., LLC v. EA*

9  *Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const.

10 art. XV § 1).

11     27.    California state law currently limits the amount collected on a loan to

12 "twelve dollars upon one hundred dollars for one year," or 12 percent. Cal. Civ.

13 Code § 1916-2. "Any agreement or contract of any nature in conflict with [the

14 interest rate cap] shall be null and void as to any agreement or stipulation therein

15 contained to pay interest and no action at law to recover interest in any sum shall

16 be maintained and the debt can not be declared due until the full period of time it

17 was contracted for has elapsed." *Id.*

18     28.    Thus, "[a]n interest rate in excess of [12%] is usurious, and if a lender

19 negotiates a loan at a usurious rate absent a qualified exemption, the agreement

20 shall be void and the lender will have no action at law to recover any interest." *Dev.*

21 *Acquisition Grp.*, 776 F. Supp. 2d at 1164 (citing Cal. Civ. Code § 1916-2).

22     29.    California law further provides that any person who pays any amount

23 exceeding the interest-rate cap may recover "treble the amount of the money so paid

24 or value delivered in violation of said [cap]." Cal. Civ. Code § 1916-3(a).

25     30.    California has also deemed the willful lending of usurious loans

26 without a license a felony "punishable by imprisonment in the state prison for not

27

1  more than five years or in the county jail for not more than one year."  Cal. Civ.

2  Code § 1916-3(b).

3       31.   In addition to abiding by California's usury cap, lenders issuing loans

4  to California residents are also required to obtain a license under the California

5  Financing Law.  *See* Cal. Fin. Code §§ 22000*, et seq.*

6       32.   Even if licensed, moreover, a licensee is still limited in the interest

7  rates it can charge based on the unpaid principal balance remaining.  *See* Cal. Fin.

8  Code § 22303 (setting, for example, a "two and one-half percent per month" rate

9  maximum on "that part of the unpaid principal balance . . . up to, including, but not

10 in excess of [$225]," while limiting the rate for the portion between $225 and $900

11 to 2 percent, and the rate for $900-$1,650 to 1.5 percent).

12      33.   Loans willfully issued by even unlicensed lenders in violation of these

13 requirements are deemed "void" and "no person has any right to collect or receive

14 any principal, charges, or recompense in connection with the transaction."  Cal. Fin.

15 Code § 22750.

16      34.   Those who willfully violate the licensing requirements are also subject

17 to fines and imprisonment.  Cal. Fin. Code §§ 22753, 22780.

18      35.   California's usury laws "are primarily designed to penalize those who

19 take advantage of 'unwary and necessitous borrowers.'"  *Dev. Acquisition Grp.*,

20 776 F. Supp. 2d at 1166 (quoting *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 692-

21 93 (Bankr. S.D. Cal. 1982)).

22      36.   Notwithstanding this regulatory scheme, Defendants conspired to

23 issue loans to Plaintiff and other "unwary and necessitous borrowers" in California

24 (and across the nation) at interest rates far exceeding the statutory maximums in the

25 borrowers' respective states of residence.

26

27

37.    Between 2022 and 2023, from her home in California, Ms. Hicks applied for and received five loans, via the internet, from Path Lending, which were for her personal use.

38.    For each loan, after entering her personal information on Path Lending's website, including her Social Security number and bank account information, she was approved for the loan nearly instantaneously.

39.    On or about March 14, 2022, Ms. Hicks applied for and received a $700 loan (the "First Loan").

40.    The First Loan agreement generated from the information Ms. Hicks entered provided for a repayment sum of $2,457.00 over twelve (12) bi-weekly payments of $204.74, for an annual percentage rate (APR) of 675.27%.  A copy of the loan agreement is attached as Exhibit 1.

41.    Path Lending deposited the $700 principal amount electronically in Ms. Hick's bank account based in California, and soon thereafter, the bi-weekly payments were electronically debited from this account.  Over time, Ms. Hicks paid back more than the $700 she initially borrowed on the First Loan.

42.    According to the First Loan agreement, Path Lending is "a lender duly licensed by the Tribal Lending Regulatory Authority of the Guidiville Indian Rancheria."  Ex. 1 at 1.

43.    The First Loan agreement also stated that the loan "IS SUBJECT TO AND GOVERNED BY THE TRIBAL LAW AND APPLICABLE FEDERAL LAW."  *Id.*  And it required borrowers to "further agree that no other state law or regulation shall apply to this Agreement, its enforcement or interpretation."  *Id.*

44.    The loan agreement also contained a "Governing Law" provision that stated that the agreement and "the Agreement to Arbitrate are governed by the laws of the [Tribe] and applicable federal law."  *Id.* at 10.

45. The agreement thus purported to preclude consumers from ever invoking their own state's laws against usurious lending, including, in Plaintiff's case, the laws of California.

46. The First Loan agreement also included an arbitration provision that, like the agreement generally, restricted the arbiter from applying any law other than "the laws of the Tribe, applicable federal law, and the terms of this Agreement," thus prospectively waiving a consumer's ability to invoke state-law defenses to both arbitration and the legality of the First Loan. Ex. 1 at 9-10.

47. The First Loan agreement is form agreement used by Path Lending for all of its loans issued in any state and uniformly prohibits the application of state laws to the loans in an obvious attempt to evade state usury protections.

48. Indeed, on or about August 24, 2022, Plaintiff applied for and received a second loan from Path Lending for $500, which required total payment of $1,755.18 over twelve bi-weekly payments, representing an APR of 793.08% (the "Second Loan").

49. Path Lending deposited the $500 principal amount electronically in Ms. Hick's bank account based in California, and soon thereafter, the bi-weekly payments were electronically debited from this account. Over time, Ms. Hicks paid back more than the $500 she initially borrowed on the Second Loan.

50. As with the First Loan, the Second Loan agreement, attached as Exhibit 2, also limited the law applicable to the loan to only "THE TRIBAL LAW AND APPLICABLE FEDERAL LAW," while requiring Plaintiff to waive any rights or protections under state law. Ex. 2 at 1. The Second Loan agreement also included the same arbitration provision limiting the arbitrator to applying only "the laws of the Tribe, applicable federal law, and the terms of this Agreement, including the Agreement to Arbitrate." *Id.* at 9-10.

1      51.    On or about September 21, 2022, Plaintiff applied for and received

2 from her home in California a third loan from Path Lending for $800, the terms of

3 which required her to make twelve bi-weekly payments of $233.99, for a total

4 repayment of $2,807.96 and an APR of 790.79% (the "Third Loan").

5      52.    Path Lending deposited the $800 principal amount electronically in

6 Ms. Hick's bank account based in California, and soon thereafter, the bi-weekly

7 payments were electronically debited from this account.  Over time, Ms. Hicks paid

8 back more than the $800 she initially borrowed on the Third Loan.

9      53.    The Third Loan agreement, attached as Exhibit 3, included the same

10 governing law and arbitration provisions as the First and Second Loans.

11      54.    On or about August 5, 2023, Plaintiff applied for and received from

12 her home in California a fourth loan from Path Lending for $300, the terms of which

13 required her to make twelve bi-weekly payments of $94.04, for a total repayment

14 of $1,128.18, representing a 906.97% APR (the "Fourth Loan").

15      55.    Path Lending deposited the $300 principal amount electronically in

16 Ms. Hick's bank account based in California, and soon thereafter, the bi-weekly

17 payments were electronically debited from this account.  Over time, Ms. Hicks paid

18 back more than the $300 she initially borrowed on the Fourth Loan.

19      56.    The Fourth Loan agreement, attached as Exhibit 4, included the same

20 governing law and arbitration provisions as the earlier loan agreements with Path

21 Lending.

22      57.    Finally, on or about September 20, 2023, Plaintiff applied for and

23 received from her home in California a fifth loan from Path Lending for $400, the

24 terms of which required her to make twelve bi-weekly payments of $119.78,

25 totaling $1,437.14, representing a 813.86% APR (the "Fifth Loan").

26      58.    Path Lending deposited the $400 principal amount electronically in

27 Ms. Hick's bank account based in California, and soon thereafter, the bi-weekly

payments were electronically debited from this account.  Over time, Ms. Hicks paid back more than the $400 she initially borrowed on the Fifth Loan.

59.    The Fifth Loan agreement, attached as Exhibit 5, included the same governing law and arbitration provisions as Ms. Hicks's other loans.

60.    At the time of each of the loans issued to Ms. Hicks, neither Path Lending nor the other Defendants were licensed under the California Financing Law.

61.    Each of Ms. Hick's loans thus violated California law in two fundamental respects: (1) Path Lending made the loan without the license required by the California Financing Law and at more than the interest rates provided by that statute; and (2) the loan included an interest rate that grossly exceeded the 12% rate cap under Cal. Civ. Code § 1916-2.

62.    The making and collection of the loans also constituted criminal violations of both statutes.  *See* Cal. Fin. Code § 22753, 22780; Cal. Civ. Code § 1916-3(b).

63.    The provisions of the loan agreements requiring payment of more than 12% interest were also deemed void under California law, and Defendants were prohibited from collecting amounts above that rate.  Cal. Civ. Code § 1916-2, 1916-3.  And Ms. Hicks is entitled to recover treble any amounts paid exceeding this cap within at least the past year.  Cal. Civ. Code § 1916-3.

64.    Further, because Path Lending, with the active participation of the other Defendants, willfully made the loan to Ms. Hicks in violation of the California Financing Law, the loans are void and Defendants were prohibited from collecting any amounts on the invalid loans.  *See* Cal. Fin. Code § 22750.

*Path Lending Issues Loans Throughout the United States in Violation of State Usury and Lending Laws*

65.     As in California, most other states and the District of Columbia recognize a similar public policy against usurious lending and have adopted laws addressing high-interest loans.[4]  These laws are a vital tool for protecting consumers in each state from predatory, high-interest loans like those at issue in this case.

---

[4] Those states include Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); O.C.G.A. § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Ind. Code Ann. § 24-4.5-5-202 (loans made without the proper authority are "void and the debtor is not obligated to pay either the principal or loan finance charge"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. Ann. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the

66.    Despite the near-universal prohibition against unlicensed, high-interest lending of small-dollar loans, Path Lending and its co-conspirators have issued and continue to issue loans throughout the United States that far exceed even the highest state interest rate caps, raking in tens (if not hundreds) of millions in unlawful profits from tens (if not hundreds) of thousands of consumers.[5]   Path Lending and Defendants have done so willfully, designing their so-called "rent-a-tribe" scheme to evade state consumer protections, including those in California.

***Path Lending's Model is a Quintessential Rent-a-Tribe Scheme used by Non-Tribal Investors to Evade State and Federal Consumer Protections.***

67.    Despite the multitude of state and federal protections to prevent usurious lending, the profits realized by making small, high-interest loans are so high that some dishonest actors—aided by lawyers willing to help them create

---

loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. Ann. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. Ann. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. Ann. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws Ann. § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code §§ 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

[5] For example, a recent case involving counsel for Plaintiff based on a very similar lending scheme settled on a class basis with more than 1 million class members and nearly $1.5 billion in cancelled loans nationwide.  *See Fitzgerald v. Wildcat*, No. 3:20-cv-0044-NKM-JCH, ECF Nos. 182-1, 194 (W.D. Va.).

1    complex lending structures that conceal their involvement—accept the significant

2    risk of litigation and liability for engaging in this criminal activity.

3          68.    Over the years, payday lenders have used various schemes to evade

4    applicable state and federal protections.    In one of these schemes, known

5    colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks'

6    supposed federally granted powers to make loans exceeding state usury rates.

7    Under arrangements made with a willing bank, the payday lender would market,

8    fund and collect loans nominally made by a bank that, for its part, earned fees

9    without assuming much, if any, financial risk for the lending.

10         69.    Because banks felt insulated from state examination and regulation by

11   virtue of federal bank preemption doctrines, many payday lenders were, for a period

12   of time, operating openly from storefronts, using these "rent-a-bank" arrangements

13   to attempt to evade enforcement in states where, like California, payday lending is

14   illegal.    However, beginning in 2005, the Federal Deposit and Insurance

15   Corporation began to scrutinize such "rent-a-bank" arrangements.    *See* FDIC,

16   GUIDELINES FOR PAYDAY LENDING, FIL-14-2005, https://www.fdic.gov/

17   news/inactive-financial-institution-letters/2005/fil1405a.html# (last visited Dec. 4,

18   2024); *see also* Michael A. Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC

19   PERSPECTIVES 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory

20   reaction).

21         70.    As this and other regulatory pressure began to reduce the prevalence

22   of rent-a-bank evasions,[6] the shadow payday loan industry turned to Native

---

[6] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday lending schemes and other financial scams. *See* Jessica Silver-Greenberg, *Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders*, N.Y. TIMES (Jan. 26, 2014).

American tribes to replace the banks as the nominal lender behind their schemes, trying to take advantage of supposed tribal insulation from state regulatory powers.

71.    Under this new "rent-a-tribe" model, the leadership of some economically impoverished tribes would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered.  In return, they would also agree to conceal the identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[7]

72.    To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the focus on the tribes and deter consumers from enforcing their rights.  Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

---

[7] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, DEM. STAFF OF H. COMMITTEE ON FINANCIAL SERVICES, 114TH CONG., SKIRTING THE LAW: FIVE TACTICS PAYDAY LENDERS USE TO EVADE STATE CONSUMER PROTECTION LAW, at 15 ("Renting Sovereign Immunity") (Comm. Print June 16, 2016), https://democrats-financialservices.house.gov/uploadedfiles/06.15.2016_committee_report_skirtingthelaw_final.pdf (last visited Dec. 4, 2024); Carter Dougherty, *Payday Lenders and Indians Evading Laws Draw Scrutiny*, BLOOMBERG, June 5, 2012, https://www.bloomberg.com/news/articles/2012-06-04/payday-lenders-and-indian-tribes-evading-laws-draw-scrutiny-1-?embedded-checkout=true (last visited Dec. 4, 2024); Jeff Guo, *Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It*, WASHINGTON POST, February 9, 2015, https://www.washingtonpost.com/blogs/govbeat/wp/2015/02/09/many-states-have-cracked-down-on-payday-loans-heres-how-lenders-still-get-away-with-it/ (last visited Dec. 4, 2024).

73.    Another central feature of the tribal business model is found in the loan agreements consumers are required to execute as a condition of receiving the unlawful, usurious loans.  The loan agreements typically purport to make consumers waive of all state and/or federal rights and seek to force them to submit to tribal law and use alternative dispute resolution procedures.  That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and/or federal laws because the loan agreements waive the application of all such law.

74.    In this case, for example, Path Lending's loan agreements do not simply select the law of the Tribe to govern them, but expressly exclude the application of any state laws, including state laws that would potentially allow a consumer to invalidate the loan agreements or choice-of-law provisions in the first place.

75.    Strict enforcement of agreements like the one here leads to unfair (and illegal) results, including the waiver of all state and/or federal rights and the inability of consumers to pursue any redress for the predatory lender's illegal conduct.  Not surprisingly, these waivers have been repeatedly invalidated by courts across the country.[8]

---

[8] *See, e.g.*, *Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 777 (W.D. Va. 2023); *Fahy v. Minto Dev. Corp.*, 2024 WL 1116050, at *14 (N.D. Ill. 2024); *Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021); *Gibbs v. Stinson*, No. 3:18CV676, 2019 WL 4752792, at *14-18 (E.D. Va. Sept. 30, 2019); *see also Gingras v. Think Finance*, 922 F.3d. 112 (2d Cir. 2019); *Brice v. 7HBF No. 2, Ltd.*, No. 19-CV-01481-WHO, 2019 WL 5684529 (N.D. Cal. Nov. 1, 2019); *Brice v. Plain Green*, 372 F. Supp. 3d 955 (N.D. Cal. 2019); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *Cooper v. W. Sky Fin., LLC*, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc.*, No. CV 16-2781, 2017 WL 1536427, at

76.     During the last decade, federal and state law enforcement agencies have taken various actions to combat tribal lending schemes, including for example:

a.     In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October, 13 2017 conviction of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[9] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November 27,2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[10]

b.     The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S.Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

---

*10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, No. 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

[9] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial-35-billion-unlawful-internet-payday) (last visisted Aug. 20, 2024).).

[10] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case) (last visited Aug. 20, 2024).

1   77.    The Tribe's lending enterprise is just another example of a rent-a-tribe

2   scheme designed to circumvent state usury regulation while taking advantage of

3   vulnerable consumers who are in such dire circumstances that they are willing to

4   accept triple-digit interest rates on relatively small sums just to pay their bills.

5   78.    Indeed, the Tribe's partnership with rent-a-tribe payday lending

6   schemes has been well publicized.  In September 2019, the Third Circuit affirmed

7   convictions against two individuals, including the "Godfather of Payday Lending"

8   Charles Hallinan, for racketeering, fraud, money laundering, and other crimes for

9   their part in a conspiracy with the Tribe and others to issue loans with triple-digit

10  interest rates in a nearly identical lending enterprise to the one alleged here.  *See*

11  *United States v. Neff*, 787 Fed. App'x 81 (3d Cir. 2019).  According to the evidence

12  in that case, the defendants conspired with others to "facially transfer [a] payday

13  loan portfolio to the [T]ribe while [the non-tribal investor] continued to provide the

14  money for the loans and the employees to collect on them."  *Id.* at 86.  Then, the

15  defendants used the Tribe to create new entities that issued thousands of loans to

16  consumers at triple-digit interest rates.  *See id.*

17  79.    A nearly identical scheme has been carried out by Defendants here.

18  Although Path Lending is purportedly owned by the Guidiville Indian Rancheria,

19  the Tribe has neither the financial resources, manpower, expertise, nor technology

20  needed to operate a national, multi-million-dollar lending enterprise, such as the

21  one at issue here.

22  80.    In fact, the Tribe itself has only approximately 100 members living on

23  its 44-acre reservation, which is far too small to support a sprawling, multi-million-

24  dollar lending operation.

25  81.    The Tribe also lacks any significant assets, including a casino,

26  minerals, or oil that could finance Path Lending's loans.

27

82.    And despite claiming to operate such a large lending operation, which includes other entities such as "The Loansmith," the Tribe has no website or online presence of its own—the web domain associated with the Tribe instead leads to an otherwise blank page stating that it is the "future home" of the Tribe's website.[11]

83.    Instead, the Tribe openly invites and accepts rent-a-tribe partnerships within the shadow payday lending industry, offering to establish lending businesses under the auspices of the Tribe and its sovereign immunity in return for a small portion of the profits, while allowing nontribal investors to reap significant profits off the backs of disadvantaged and unwary consumers across the United States.

84.    The Tribe's partnership with non-tribal payday lending schemes started in 2010, when it passed a "Tribal Lending Regulatory Ordinance" (the "Ordinance") that was written for the Tribe by outside counsel representing the interests of online payday lenders seeking to engage in "rent-a-tribe" schemes.

85.    This Ordinance authorized the Tribe to license lending entities, including Path Lending.

86.    The Ordinance does not require a licensed lender to be a tribal member, nor does it require that a certain percentage of the loans issued by the licensee come from tribal funds or support tribal objectives.

87.    Hallinan and others then used the Ordinance to shield several lending businesses behind the Tribe's sovereign immunity.

88.    Hallinan even pressured the Tribe to remove the 36-percent interest cap previously imposed by the Ordinance under the threat that he would find another Tribe for his operations if the cap remained.

---

[11] *See* http://guidiville.net/ (last visited Dec. 4, 2024).

89.  As is the case here, under Hallinan's scheme, the Tribe claimed to be the owner and operator of the lending businesses, when they were in fact entirely run by Hallinan and his non-tribal companies.

90.  According to federal prosecutors, Hallinan raked in $3 million ***per month*** from his lending scheme with the Tribe, while the Tribe received a mere $20,000 per month.

91.  Hallinan also claimed that the loans "originated" on the Tribe's reservation because they were issued by a server located in a cargo container on the Tribe's land.  But this was also false, as the container was completely empty.

92.  Eventually, Hallinan was convicted and sentenced to sixteen years in prison and fined $64 million for his part in the scheme.

93.  But this conviction did not dissuade Defendants, who continued to issue high-interest, low-dollar loans under a very similar model to the one that Hallinan pioneered.

94.  Indeed, the Tribe is behind other lending entities, including The Loansmith, which, like Path Lending, claims to be wholly owned by the Tribe and to operate on tribal land.  In reality, The Loansmith is operated by non-tribal individuals and entities, including Bart Miller and Centrinex, LLC, a company based near Kansas City, which provides services to multiple online payday lenders.

95.  As with these other operations, the loans issued by Path Lending do not originate from the Tribe's reservation but are in fact issued from Walnut Creek, California, where the IP address for PathLending.com is located.

96.  Borrowers, including Plaintiff, also apply for their loans from off-reservation locations through Path Lending's website, and there is no record of Path Lending having a physical office on the Tribe's reservation.

1    97.    Loan funds are deposited electronically by Path Lending to bank

2    accounts maintained on non-tribal lands, and consumers make payments on their

3    loans through automatic draws from those off-reservation accounts.

4    98.    The operations of Path Lending also occur outside of tribal lands and

5    are substantially for the benefit of Milks, Thunderbird, and other nontribal

6    coconspirators, including investors, employees, and vendors who all live, work, and

7    operate beyond tribal lands.

8    99.    As courts have found based on similar facts, Path Lending's operations

9    thus constitute off-reservation activity subject to state regulation, including state

10   usury laws.   *See Hengle v. Treppa*, 19 F.4th 324, 348-49 (4th Cir. 2021); *cf.*

11   *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018)

12   ("However, the patrons' act of placing a bet or wager on a game of DRB while

13   located in California constitutes gaming activity that is not located on Indian lands,

14   violates the UIGEA, and is not protected by IGRA.")

*Milks' and Thunderbird's Personal Involvement in and Control Over the Path Lending Enterprise*

17   100.    Milks and his company Thunderbird are the masterminds behind and

18   directors of Path Lending's operations.

19   101.    Around April 2012, Milks registered PathLending.com through his

20   company Paycrom Holdings, Ltd.

21   102.    Paycrom Holdings, Ltd. is a shell company registered in the Isle of

22   Man, United Kingdom.

23   103.    Milks is the owner and sole proprietor of Paycrom Holdings.

24   104.    Upon information and belief, Milks became involved in payday

25   lending through his work for Evergreen Capital Partners, a business in Kansas City

26   run by Scott Tucker.

27

105.   Tucker and his companies have made loans to over 4.5 million Americans at interest rates typically exceeding 700% APR, and he and his cohorts have collected $3.5 billion in revenue through rent-a-tribe schemes.

106.   Tucker was convicted of racketeering in 2017 and sentenced to 16 years and 8 months in federal prison, where he currently resides, due to his involvement in predatory lending enterprises.

107.   Through his association with Tucker, Milks sought out his own rent-a-tribe scheme in and around 2012.  In addition to registering the PathLending.com domain name, he established Thunderbird to facilitate Path Lending's operations by funneling money from himself and other, yet-to-identified coconspirators through Thunderbird to finance the loans, and then directing revenues from the loans back through Thunderbird to himself and the other investors.

108.   Thunderbird and Milks also arranged for agreements and partnerships that provide the employees, facilities, and infrastructure to issue, service, and collect on the loans, to the benefit of Milks, Thunderbird, and their coconspirators, from locations outside of the Tribe's reservation.

109.   Upon information and belief, Milks facilitated and executed the partnership and revenue-sharing agreements with the Tribe that allowed Path Lending to claim the façade of Tribal ownership, when in reality Path Lending was controlled and operated by Milks, Thunderbird, and their nontribal coconspirators.

110.   The Path Lending enterprise has been making, and collecting, unlawful loans in California and other states since at least 2014.

111.   Upon information and belief, instead of receiving meaningful benefits from the lending operation, the Tribe sanctions the operations of Path Lending and other lending entities on behalf of Milks, Thunderbird, and other nontribal participants who design and direct the tribal lending scheme that charges unconscionable interest rates in violation of state usury and licensing laws.  Milks,

Thunderbird, and the other nontribal coconspirators are the primary recipients of the revenues from the lending operation and provide the funds for the loans issued to Plaintiff and other consumers.

112. To engage in this extremely profitable, but illegal business, Milks, Thunderbird, and other, deliberately hidden principals have entered into agreements with the Tribe, Path Lending, and others to make and collect on usurious loans across the country, including in California, and to keep their identities hidden from consumers and regulators.

113. Upon information and belief, each Defendant is aware of the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans.

114. For instance, in addition to the criminal prosecution and conviction of Hallinan in 2017 for his role in a very similar lending scheme involving the Tribe, the Tribe's lending operations have faced legal challenges, including class action lawsuits filed against Path Lending and The Loansmith, as well as Milks and Thunderbird.[12]

115. Additionally, each of the Defendants is aware that many consumers have complained about the abusive lending practices used by Path Lending and other lending entities associated with the Tribe.

116. For example, Path Lending's Better Business Bureau profile has an average rating of 2/5 due to the number of negative reviews, which include complaints about its usurious lending.[13]

---

[12] *See Harrell v. Coho Fin. d/b/a Path Lending*, No. 5:24-cv-00414 (M.D. Fla.); *McCune v. Choice Capital Fund*, No. 1:23-cv-01784 (S.D. Ind.).

[13] *See* Business Profile: Path Lending, BBB, https://www.bbb.org/us/ca/ukiah/profile/loans/path-lending-1116-533988 (last visited Dec. 4, 2024).

117.   And Defendant Duncan is a member of the Board of Directors for the Native American Financial Services Association,[14] which represents the interests of tribal lending enterprises like the one at issue here and is at the forefront of the legal issues surrounding such schemes.

118.   Despite their awareness of their unlawful and unethical lending practices, Defendants continue to oversee and operate Path Lending to facilitate the issuance of triple-digit-interest loans that violate usury laws across the country.

119.   Upon information and belief, a significant portion of the lending operations done under the name Path Lending are operated by Milks, Thunderbird, and other third parties that are not located on tribal lands.  These non-tribal outsiders supply all the lending capital and handle and control all or part of the marketing, underwriting, funding, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management for the business. They also exert significant control over all or a portion of these activities regardless of the location where these activities occur.

120.   At the same time, Duncan and the other yet-to-identified Tribal Council members continue to facilitate the illegal lending scheme by allowing Path Lending and the TLEs to make and collect on usurious and void loans in multiple jurisdictions, including California.

121.   The regulatory oversight of the Tribe's lending operations is also obscured and intentionally designed to perpetuate the unregulated usurious lending of the tribal lending entities, including Path Lending.

122.   For example, although the loan agreements state that Path Lending is "a lender duly licensed by the Tribal Lending Regulatory Authority," Plaintiff cannot locate any information regarding Path Lending's operations within the

---

[14] NAFSA Board of Directors, NAFSA, https://nativefinance.org/about-nafsa/nafsa-board-of-directors/ (last visited Dec. 4, 2024).

Tribe's reservation or the existence of the "Tribal Lending Regulatory Authority." The Tribe has no online presence.  Plaintiff also could not identify any evidence that the Tribe has taken regulatory or judicial actions with respect to Path Lending, or any other TLE for that matter.  Based on this information, the Tribe's Lending Regulatory Authority is in fact illusory, and they have no active employees, regulators, or judges.

123.  Defendants' attempts to evade state usury protections also extend to the form loan agreements used by Path Lending, which prospectively waive the application of all state laws, including those that could challenge the application of the Tribe's laws under the loans' choice-of-law provision.  The loan agreement at issue states *inter alia*, that "THIS LOAN . . . IS SUBJECT TO AND GOVERNED BY THE TRIBAL LAW AND APPLICABLE FEDERAL LAW" and that the consumer "agree[s] that no other state law or regulation shall apply to this Agreement, its enforcement or interpretation." *See, e.g.*, Ex. 1 at 1.

124.  As such, the form agreements purport to strip consumers like Plaintiff of the right to challenge the application of the Tribe's laws to their loans under the public policy and laws of their own states of residence, including California, which have a long and robust history of prohibiting usurious lending operations like Path Lending that burden their citizens with insurmountable debts.

125.  Further, the loan agreements at issue (like the other form agreements that are substantially similar) include an arbitration provision that purports to require arbitration of any claims a borrower may have against Path Lending, including state law claims or possible state defenses to arbitrability, but the arbitrator can apply only the laws of the Tribe and "applicable federal law." *See* Exhibit 1 at 9-10. The arbitrator may not consider any possible state law defenses to enforcement of the loan agreements, including that the agreements' selection of tribal law to the exclusion of California law violates the state's public policy against

unlicensed usurious lending.  As such, the agreement purports to prospectively waive any right of consumers like Plaintiff and others in states with usury regulations to challenge the choice-of-law provision that exclusively selects the law of the Tribe to the preclusion of any other state law.

126.   Similarly, while the loan agreement at issue purports to require arbitration of all possible claims, including claims arising under state law (Ex. 1 at 9), it simultaneously purports to preclude arbitrators from ever applying the law of any state to determine those claims, including in instances where the law of the state applies regardless of any choice of law provision.  And in the same vein, it also purports to preclude the application of any state defenses to arbitrability, as those would necessarily require the application of state law that the agreement expressly prohibits.  As such, the arbitration provision in this and other form loan agreements is wholly unenforceable.

127.   Moreover, the loan agreements allow enforcement of the arbitration award only in the ill-defined "tribal court," the jurisdiction and location of which is not specified, further undermining consumers' ability to obtain meaningful relief. *See, e.g.*, Ex. 1 at 10.

## CLASS ACTION ALLEGATIONS

128.   Plaintiff brings her claims on behalf of herself and, under Fed. R. Civ. P. 23(b)(3), on behalf of the following Classes, of which she is a member:

### RICO Class

All persons who obtained loans from Path Lending from the beginning of the period commencing four years prior to the filing of this action, who, at the time the loan was made, were residents of any states other

than Nevada or Utah, and who made payments on such loans in an amount more than the amount of loan proceeds they received.

### California Usury Class

All California consumers who made a payment on any loan with Path Lending within three years of the filing of this lawsuit.

### California Damages Subclass

All California consumers who made a payment on any loan with Path Lending within one year of the filing of this lawsuit in an amount more than is the authorized under California law.

129.    The identity and of the members of the above Classes will be easily ascertainable from the records of Defendants.

130.    **Numerosity. Fed. R. Civ. P 23(a)(1).**  Currently, Plaintiff does not know the exact number of members of each Class.  However, based on the class sizes in similar cases, Plaintiff anticipates that there are likely thousands, if not hundreds of thousands, of members.  Thus, the Classes are so numerous that joinder of all members is impracticable.

131.    **Typicality. Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of the claims of each putative class member.  In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative Classes.  All are based on the same facts and legal theories.

132.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Classes because her interests coincide with, and are not antagonistic to, the interests of the members of each Class; she has retained counsel competent and experienced in such litigation; and she has prosecuted, and intends to continue to prosecute, this action vigorously.  Plaintiff and her counsel will fairly and adequately protect the interests of the members of each Class.

1    Neither Plaintiff nor her counsel have any interests which might cause them not to

2    vigorously pursue this action.

3        133.   **Predominance of Common Questions of Law and Fact**. **Fed. R.**

4    **Civ. P. 23(a)(2) and 23(b)(3).**  Common questions of law and fact exist as to all

5    members of each Class, and there are no factual or legal issues that differ between

6    the putative class members.  These questions will predominate over the questions

7    affecting only individual class members.   The common questions include: (1)

8    whether the form loan agreements contain invalid and unenforceable choice-of-law

9    and arbitration provisions; (2) the facts surrounding the organization, structure and

10   funding of the underlying enterprise, including with regard to control over the

11   business and the performance of the various lender functions, as well as the flow of

12   lending capital and revenue; (3) the nature and extent of Defendants' knowledge

13   and participation in the affairs of the enterprise; (4) whether the loans are "unlawful

14   debt" for purposes of RICO; (5) whether the loans are unlawful loans under

15   California law; (6) whether Defendants violated RICO and/or California law by

16   collecting on the loans; and (7) what is the proper recovery for Plaintiff and the

17   class members against Defendants.

18       134.   **Superiority**. **Fed. R. Civ. P. 23(b)(3).**  Questions of law and fact

19   common to the class members predominate over questions affecting only individual

20   members, and a class action is superior to other available methods for fair and

21   efficient adjudication of the controversy.  The damages sought by each member are

22   such that individual prosecution would prove burdensome and expensive.  It would

23   be virtually impossible for members of the class individually to effectively redress

24   the wrongs done to them.  Even if the members of the class themselves could afford

25   such individual litigation, it would be an unnecessary burden on the Courts.

26   Furthermore, individualized litigation presents a potential for inconsistent or

27   contradictory judgments and increases the delay and expense to all parties and to

1  the court system because of the legal and factual issues raised by Defendants'

2  conduct. By contrast, the class action device will result in substantial benefits to

3  the litigants and the Court by allowing the Court to resolve numerous individual

4  claims based upon a single set of proof in a case.

5      135. **Injunctive and Declaratory Relief**. **Fed. R. Civ. P. 23(b)(2).**

6  Defendants have acted or refused to act on grounds that apply generally to the class,

7  rendering injunctive and declaratory relief appropriate respecting the class as a

8  whole.

**COUNT I**
**Violation of RICO, 18 U.S.C. § 1962(a)**
**(RICO CLASS CLAIM AGAINST DEFENDANTS MILKS AND THUNDERBIRD)**

12     136. Plaintiff incorporates the preceding allegations.

13     137. Defendants are each a "person" as that term is defined in 18 U.S.C. §

14  1964(3), and are being sued in their individual capacities with regard to their own

15  individual conduct.

16     138. Defendants, along with the Tribe and others, were and continue to be

17  members and associates of an internet lending association-in-fact that will be

18  referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

19     139. The Usurious Lending Organization, including its leadership,

20  membership, and associates, constitutes an "enterprise" as that term is defined in

21  18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

22     140. The members and associates of the Usurious Lending Organization

23  shared various common purposes, including the evasion of state usury and licensing

24  law, the operation of the "Path Lending" website, the processing of applications

25  from consumers across the United States, the collection of payments from

26  borrowers, and the division of generated revenues in accordance with written

27  agreements.

141.   The Usurious Lending Organization assigned specific roles to the members and associates. Milks, Thunderbird, and other nontribal coconspirators designed and directed the Organization and distributed the revenues generated in accordance with the said written agreements.   The role of the Tribe and Path Lending was primarily to establish and organize the tribal façade for the Organization and to take various measures designed to reinforce the fiction that the Organization is a tribal-run business.

142.   The Usurious Lending Organization has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

143.   The Usurious Lending Organization has been engaged in, and its activities affected, interstate commerce.   Milks and Thunderbird operate the Organization from locations outside the Tribe's reservation in states other than California and issue loans to consumers in several States, including California.  The Organization sends loan proceeds into and collects payments from locations throughout the United States.

144.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

145.   Defendants Milks and Thunderbird violated 18 U.S.C. § 1962(a) through the receipt of income derived, directly or indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

146.   All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

147.   As alleged, each of the Defendants participated in the collection of unlawful debt as a principal by aiding, abetting, procuring the proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

148.   Plaintiff and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(a) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

149.   Accordingly, Defendants Milks and Thunderbird are jointly and severally liable to Plaintiff and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II
### Violation of RICO, 18 U.S.C. § 1962(b)
### (RICO CLASS CLAIM AGAINST ALL DEFENDANTS MILKS AND THUNDERBIRD)

150.   Plaintiff incorporates the preceding allegations.

151.   Defendants Milks and Thunderbird violated § 1962(b) of RICO, 18 U.S.C. § 1962(b), by acquiring and maintaining interests in and control of the Enterprise involved in the collection of unlawful debts affecting interstate commerce.

152.   All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

153.   As alleged, each of the Defendants participated in the collection of unlawful debt.

154.   Plaintiff and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(b) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

155.   Accordingly, Defendants Milks and Thunderbird are jointly and severally liable in their individual capacities to Plaintiff and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III
### Violation of RICO, 18 U.S.C. § 1962(c)
### (RICO CLASS CLAIM AGAINST ALL DEFENDANTS)

156.   Plaintiff incorporates the preceding allegations.

157.   Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

158.   All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

159.   As alleged, each of the Defendants participated in the collection of unlawful debt.

160.   Plaintiff and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

161.   Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT IV
### Violation of RICO, 18 U.S.C. § 1962(d)
### (RICO CLASS CLAIM AGAINST ALL DEFENDANTS)

162.   Plaintiff incorporates the preceding allegations.

163.   Defendants violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring to violate § 1962(a), (b), and (c).

164.   Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

165.   Plaintiff and the RICO Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

166.   Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Class for actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## <u>COUNT V</u>
**Violation of California Usury Law, Cal. Civ. Code § 1916-2, 1916-3**
**(CALIFORNIA DAMAGES SUBCLASS CLAIM AGAINST ALL DEFENDANTS)**

167.   Plaintiff incorporates the preceding allegations.

168.   Defendants issued loans to Plaintiff and the California Damages Subclass with interest rates far exceeding the rate permitted under Cal. Civ. Code § 1916-2.

169.   Defendants are not licensed to issue loans in California or otherwise entitled to any exemptions from the interest-rate cap that would permit them to issue loans with triple-digit interest rates to California consumers.

170.   Plaintiff and the California Damages Subclass made payments on their respective loans that exceeded the amount to which Defendants were lawfully entitled under Cal. Civ. Code § 1916-2.

171.   Plaintiff and the California Damages Subclass are thus entitled to recover treble the amounts paid in excess of the lawful interest rate under Cal. Civ. Code § 1916-3(a).

**COUNT VI**
**Declaratory Judgment**
**(CALIFORNIA USURY CLASS CLAIM AGAINST ALL DEFENDANTS)**

172.   Plaintiff incorporates the preceding allegations.

173.   Defendants issued loans to Plaintiff and the California Usury Class with interest rates far exceeding those permitted under Cal. Fin. Code § 22303.

174.   Defendants are each a "person" as that term is defined by Cal. Fin. Code § 22008.

175.   Defendants willfully violated Cal. Fin. Code § 22303.   The entire purpose behind the Enterprise was to evade state usury protections, including the interest rate caps and licensing regime established by California law.   Defendants intentionally conspired and acted in concert to create and establish a lending operation under the façade of the Tribe for the purpose of using tribal sovereign immunity to ostensibly evade state usury protections.   Milks and Thunderbird would not have partnered with the Tribe but for this sole purpose.

176.   Because Defendants willfully charged, contracted for, and received amounts other than, or in excess of, the charges permitted by the California Financing Law, the loan agreements entered by Plaintiff and the California Usury Class are void, and "no person," including Defendants, "has any right to collect or receive any principal, charges, or recompense in connection with the [loans]."  Cal. Fin. Code § 22750.

177.   Further, Cal. Civ. Code § 1916-2 provides that the agreement to pay interest above 12 percent is "null and void" and that no person can collect interest on the loans "in any sum."

178.   At a minimum, therefore, the loan agreements are unenforceable to the extent they seek any interest, and Defendants should be enjoined from collecting such interest.

179.   Plaintiff and the California Usury Class are subject to ongoing harm absent a declaration that the loans and the interest provisions of the loan agreements are void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

180.   The dispute and controversy is a justiciable matter that is not speculative, and the resolution by this Court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice-of-law and forum-selection provisions of those contracts.

181.   Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

182.   Accordingly, Plaintiff and the California Usury Class seek a declaratory judgment against Defendants that the loans issued to them are void, invalid, and uncollectable, or at a minimum that no interest can be collected on the loans.  Plaintiff and the Class also seek all appropriate corresponding equitable relief, including to enjoin Defendants from collecting on or allowing the collection on the loans or, at a minimum, the collection of any interest on the loans.

## COUNT VII
### Unjust Enrichment
### (CALIFORNIA DAMAGES SUBCLASS CLAIM AGAINST ALL DEFENDANTS)

183.   Plaintiff incorporates the preceding allegations.

184.   All of the loans issued to Plaintiff and the California Damages Subclass were void.

185. Plaintiff and the class member conferred a benefit directly on Defendants when they made payments on the void loans in excess of the loan proceeds; Defendants knew or should have known of the benefits; and Defendants have been unjust enriched through their receipt of any amounts in connection with the unlawful loans.

186. Accordingly, Plaintiff and the California Damages Subclass are entitled to all amounts repaid on any loans with Path Lending.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Classes, seeks the following relief:

a. Determining that this action may proceed as a class action under Fed. R. Civ. P. 23.

b. Designating Plaintiffs as the class representatives for the Classes;

c. Designating Plaintiffs' Counsel as counsel for the Classes;

d. Issuing proper notice to the Classes at Defendants' expense;

e. Declaring that Defendants committed multiple, separate violations of RICO and California law;

f. Declaring that the loans issued to the California Usury Class are void, invalid, and uncollectable;

g. Enjoining any collection on the loans by Defendants and any parties acting in concert with them;

h. Awarding compensatory damages as pled herein;

i. Awarding treble damages pursuant to 18 U.S.C. § 1964(c) and Cal. Civ. Code § 1916-3;

j. Awarding reasonable attorneys' fees and costs and expenses; and

k. Granting other relief, in law or equity, as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff, on behalf of herself and the Classes, demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

*/s/ Jessica Garland*
Jessica Garland
(State Bar No. 344535)
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336
*jessie@guptawessler.com*

Matthew W.H. Wessler*
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

Kristi C. Kelly*
Andrew J. Guzzo*
Matthew G. Rosendahl*
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
*kkelly@kellyguzzo.com*
*aguzzo@kellyguzzo.com*
*matt@kellyguzzo.com*

*Attorneys for Plaintiff*

* *pro hac vice* forthcoming